Good morning, Your Honor. Stephanie Carvelin. If it pleases the Court, I'm counsel for the appellant in this case, Felipe Almonte-Polanco. The issue this case presents is an individual's ability to rebuff an officer's attempt to engage in a consensual encounter and walk away. Mr. Almonte-Polanco and friends were sitting on a fence surrounding a parking lot at Worldwide News. In Rochester, New York, police officer William Baker approached, tried to engage in conversation with the men, had several sort of preliminary statements, how you're doing, what you're doing, comment about the weather. And then he said, what are you men doing here, or something to that effect. And the individual, one of the people who was with Mr. Almonte-Polanco, got up and walked away, or attempted to walk away. But not the defendant himself, it was someone else, right? Yes, Your Honor. The individual with Mr. Almonte-Polanco got up and attempted to walk away. The police officer told him, no, no, no, man, you're good, you can hang. And essentially pointed to where this gentleman, Brian, we learned his name is later, had been seating. Brian sat back down. At that point, Officer Baker effected a seizure of not only Brian, Your Honor, Your Honors, but all three of those individuals. And why is that? I mean, he didn't direct Brian to sit back down. He said, you can hang, you're good. And just looking at that language, that could be an invitation to remain. I mean, if it were not a police officer, would you call that a seizure? No, perhaps not. But it is a police officer, and we have to look at it in the circumstances of the individual. And he is a police officer. And Brian is already sitting there, Judge. An invitation to remain has significance. He's not truly saying, let's sit back down. He's telling him, he's directing him to sit back down. But isn't another way of interpreting that comment, don't worry, I'm not ordering you to disperse. Here are three guys sitting on a fence. They could reasonably assume that when the police officer is coming, he's going to say, hey, don't be hanging around here. You know, go off and do whatever you're doing elsewhere. And that's what one guy was looking to do, thinking, oh, I'm going to get kicked out of here. And the police officer said, no, no, no, don't worry about it. You're okay. And then he went back and sat down. Why is that not a permissible interpretation of what happened here? Well, I think it is, and for several reasons, Your Honor. First of all, he points to him to sit back down. He doesn't, if the issue were. When you say to sit down, I think you're suggesting that sort of in the imperative mood, directing him to sit down. My question is, when he pointed to where he was, why is that considered, again, imperative? And no, no, you're free to go right back to where you were before. Don't think I'm ordering you to disperse. But why would he? He has every right to be sitting there on the fence doing what he's doing, which is nothing illegal. Right, and isn't that arguably what the police officer was telling him? You're not doing anything wrong. As opposed to what police often do, which is tell everybody, break it up, get out of here, get out of here. Well, let me use an analogy. If Brian, for example, if Brian had his hand in his pocket, he started to reach toward his pocket. And the police officer said, no, no, you're good, man. Take your hand. Your hand doesn't need to be in the pocket. I mean, it's a direction to Brian. He's already sitting there. Although, actually, in that circumstance, it would strike me that perhaps that comment in your hypothetical could be understood to say, oh, don't worry, you don't have to show me ID right now. I'm not asking you for anything. We're just talking. I think there's several other factors that inform the interaction between the officer and the men, including the fact that the officer says, I know the deal down. I know you all know. You, Brian, you live here. You know the deal down here. The deal down here is the police come and try to question people. That's the deal down there. Is that deal stated? I'm sorry? Where's the evidence that's the deal? What is the inference? You guys, the officer is asking, Brian, you know, don't worry about this. I'm just going to ask you some questions. It's essentially a background. You know what the deal is around here. But that conversation took place after the moment at which you say the seizure occurred. Yes, that is true. I say, Your Honor, that by telling Brian, essentially telling Brian, sit back down, pointing him to the bench that he just got up from, the officer is directing him to remain. That's an interesting question. It wasn't in a menacing way. If I, in a menacing way, certainly in a tone of voice is part of what the court considers, whether there was some sort of show of force is part of what the court considers. Also part of what the court considers is that that's a heavily policed area, as the officer himself says, and what the circumstances. I'm sitting here having a conversation with my friends. Police officer comes over, starts to ask me questions. Last question he asked me is, what are you men doing here? That's the last question, Your Honor. And at that point, Brian decides to exercise his Fourth Amendment right to not engage in a consensual encounter with the police. And he gets up and starts to walk away. And he is, in my, I think, the only reasonable inference from what the officer says in those circumstances. And it has to be viewed from the position of the person in those circumstances. How do you distinguish a case like Delgado, INS v. Delgado, where the Supreme Court talked about agents being stationed at all the exits to a factory and then agents went through the workplace having encounters with each of the employees to look into the possibility that undocumented workers were working in the factory? And the court said there wasn't a group seizure and there wasn't a seizure in these consensual encounters. And that's, you know, at least superficially, and we don't have the video of that as we have the video of this, but that seems more an assertion of authority substantially than what we see on the video in this case. Certainly locking the room or the factory and not allowing people to leave is a greater assertion of authority. I think Your Honor's question- I think they weren't, I think it wasn't that they were not allowing them to leave, but it looked like they were not allowing them to leave, would be your argument. And I think this gets into what Judge Puller is asking as well, which is what about the individual component of this? Is this directed at him? What would a person in those circumstances have believed? And the other is what a show of authority is necessary to constitute the termination of a consensual encounter and the initiation of a preventive detention. In terms of the individual or group component of it, I'm part of a group of three people. We're all in the same circumstance. The police officer approaches us. One of us tries to get up and move away and is told not to, essentially. I believe a reasonable person in that circumstance would believe they are similarly situated. And, in fact, he was. He was as it develops. He's not allowed to leave. Second, I think if I'm remembering correctly, in Delgado there's discussion about immigration, the particular components of what specifically the police were looking for here. There. This is the essence of an individual's Fourth Amendment right to terminate a consensual encounter. I have a right to say no. If I don't have a right to say no, then the entire theory behind a consensual encounter fails. Counsel, before we hear from the prosecution, would you discuss the appellate waiver? Yes. The government is correct that the appellate waiver, I think it specifically says he can, he carves out the ability to appeal the seizure of evidence from himself on July 23rd and possibly July 24th, although no evidence. And also the evidence seized from his home. So why isn't this, which is not the suppression of evidence necessarily, but the stop, why isn't that waived? Well, because what we're moving to suppress is exactly that, is evidence. Evidence that's seized as a result of the impermissible, what we argue is the impermissible detention, preventive investigative detention. Okay. Can I just ask about that? Yes, of course. If we get past the waiver, you say in your brief that at some point this ripens into an arrest. And let's assume for the moment that we're pretty sympathetic to that argument. It's two and a half hours. What statements are you seeking to suppress on Miranda grounds? Well, just to clarify, I don't think the government is arguing that the appellate waiver bars us from contesting the evidence. I think that they argue that it bars me, Mr. Amante, Polanco, and myself from contesting the statements, the Miranda issue. Right. The statements that we are seeking to contest either as the fruit of that initial illegal seizure are all the statements that Mr. Amante makes during, Polanco makes during the entire encounter. Where were you born? Were you born in Rochester? What's your name? But you don't identify a particular moment where you say this is where this, what you say is a seizure ripened into an arrest. Okay. What I do say, Your Honor, is that the moment that there was a, that he tells Brian not to leave, that's a preventative detention. It's a Terry stop. It must be supported by reasonable suspicion, and it's not supported by reasonable suspicion. Okay. And that would be on Fourth Amendment grounds. That's correct. You're asking that the early statements, and the Miranda argument kicks in at a point later, but you're not sure exactly where. Well, I think the Miranda argument, the government points out correctly that the appellate waiver does not permit us to appeal on Miranda grounds. I get it now. So you're conceding that point. I am saying that those statements would be suppressed on Fourth Amendment grounds as the fruit of the initial illegal seizure. Got it. Very, very helpful. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Tiffany Lee, and I represent the United States. Your Honor, turning to the encounter on July 23rd with Officer Baker and Mr. Armante Polanco, and viewing the totality of the circumstances, everything that happened up until the point that Mr. Armante Polanco presented his Monroe Community College identification card was a consensual encounter. I understand counsel's point that at one point, Officer Baker saw Brian, the individual later identified as Brian, stepping up to walk away. But when you view the body-worn camera footage from Officer Baker's camera, you can see that his tone and his language was anything but a direction, an imperative, or ordering compliance. He started the conversation riding up on his bike saying, what's up? How are we doing? He noticed the weather. It was raining. What you doing out here? And then he was like, hey. When Brian stood up to walk away, it's all right. Feel free. You're welcome to stay. Counsel argues that it was not precatory when he said that. They took it to mean that there was no leaving this little group. That's how the three of them, including the defendant here, took that sentence. But the view is the totality of the circumstances analysis is objective. So in terms of what would a reasonable person view, counsel has added, well, this is a high crime area. Brian has had other encounters with Officer Baker before. And that conversation, as to that, happened all after Officer Baker took Mr. Almonte Polanco's ID card. But a reasonable person who's sitting on the park bench where a police officer comes up on bicycle and is just asking, hey, how's it going? How are you hanging? You know, what's happening? I don't think that person, a reasonable person, would have the objective feeling that they were being ordered to comply. This is an officer. He's on a bike. He's known to be, you know, he approaches the three men and they recognize him as an officer. He says, what are you doing? And then he gestures. A man starts to walk away, gestures back toward the place where the man had been sitting and said, well, you can hang. I mean, what reasonable person would think that that's not, would feel, no, I can keep walking. It's a direct, you know, wouldn't you reasonably think I need to sit back down? He's asking me, directing me, to sit back down. And he's an officer and he's just driven up to me to have a conversation. Why wouldn't you characterize this as I tried to walk away and I was told that I couldn't? Because, again, you're looking at tone, the language that's being used, the circumstances that this is not in an enclosed space. It's open and notorious. They're sitting out in the open. There are other people walking up and down St. Paul. This is completely a situation when you're looking at the totality of the circumstances where everything is indicative that this is a situation in which a person, Brian could have said, no, I'm good, I'm going to go back to my apartment across the street. How do you integrate with that information the fact that Mr. Almonte Polanco had previous dealings with Officer Baker? He knew him. He said he had been hassled by him before. Okay. So he recognizes him when he says, how you doing? What does that tell you? That doesn't, I don't think that changes the objective totality of the circumstances analysis. And that Baker already knew him. Baker had to know him since they had a previous interaction. That's true. They did have a previous interaction, but none of that changes the totality of the circumstances when you're viewing this encounter. From the time that Officer Baker arrives on scene, sees the three men sitting on the railing, has that conversation, to the time when he has Mr. Almonte Polanco's identification. Could I ask, to what extent does it matter that we're, we've been talking about how Baker went back and sat down, right? And it sounds like some of our questions we're asking, well, did Baker perceive the officer's statement as an instruction or as an invitation, right? But we really don't care about that, right? We care about whether Mr. Almonte would have viewed himself as free to leave. So how much does it matter that however one characterizes the police officer's statement, from Mr. Almonte Polanco's standpoint, he saw the police officer gesture towards the fence, and then he saw Mr. Baker return. Does that amplify the suggestion to Mr. Almonte Polanco that it was in fact a command or a direction because he saw Mr. Baker arguably comply with the directive. Regardless of the officer's tone, do you see what I'm saying? I do. What Mr. Baker then did in response to the tone, color the way in which Mr. Almonte Polanco would have reasonably perceived it. I will say that it may add a tint or a shade to the encounter, but irrespective of that, when you're listening to the tone of Officer Baker, regardless of how Brian complied with it, Mr. Almonte Polanco could have been, well, I would have taken off. Ultimately, the totality of the circumstances would be, what is a person without just objectively looking at this situation, being in this situation, how would they feel? When you're looking at that, you're looking at the police officer's actions to evaluate. To the extent that some other person may have objectively here, looking at all these circumstances in a totality, does this rise to a level of seizure? Does this leave the realm of consensual encounter to the realm of potentially investigative detention? We say no. We say everything with tone and compliance, the setting, everything, even including if Almonte Polanco thought a little bit, well, he sat back down. The fact that Brian made the decision to sit back down. When do you believe seizure took place? We believe that as soon as Officer Baker had Almonte Polanco's ID card and didn't give it back, that that's when the Terry detention began, because at that point he had information already that this person is the person that they've been looking for with the identification of Soto Torres. How do we know that? This is where we get into the Officer Awareness Bulletin that was issued by Cynthia Murator of the Rochester Police Department. It issued an Officer Awareness Bulletin, which basically described Felipe Almonte Polanco as an individual who is wanted in connection with an incident that had happened in the St. Paul area and had described him as being an individual who has the alias of Manuel Soto Torres. So there's nothing illegal about having an alias, correct? That is correct, that there is nothing illegal about having an alias. However, Investigator Murator had information, which was part of her search warrant application, that there is a real individual by the name of Manuel Soto Torres and that that person is not Felipe Almonte Polanco. Did that person make a complaint? No. What had happened was there had actually been a bench warrant issued, which this information is all part of the search warrant application. Investigator Murator described her having that there was a bench warrant issued against Felipe Almonte Polanco and that therefore she believed that he was I am because of the fact that during the course of the videotape, the body worn camera footage, he refers to the bulletin and that he also the first person he calls is Investigator Cindy Murator, who is the person who drafted and issued the bulletin. And indeed, Magistrate Judge Peterson How do we know he called that? How do we know he called? I saw the footage where he's speaking to a woman and I assume it's the officer involved. But how do we know he placed that call? Do we see him do that? We don't see in place. We don't see him place the call. How do we know that he knew about the bulletin at the time that he detained Mr. The fact that basically we would have known it because of the fact that holding of the card prompts him to call who we assumed to be at first Investigator Murator and then later back up a second. I thought you just said that we don't have evidence that he placed the call as opposed to receiving a call. How do we get there? You're taking the step that I thought we just said we don't know. Oh, no, he did make a call. You can hear him calling on his body worn camera immediately that he goes into another officer's car, calls, makes a call and says this guy is showing me Manuel Soto Torres. Is he Felipe? You hear a female voice reply, Felipe. Like you guys, the government objected to having a hearing in this case. Am I right about that? That's correct. I mean, wouldn't it have been simpler to put the officer on the stand? I mean, this this bulletin is introduced into evidence at a late stage in this proceeding. After all, if I'm understanding chronology after oral argument on the suppression motion. Yes, I could have put both officer Baker investigator Murator on the stand and cut time time by time and explain what's going on in the video in order to amplify and provide more information. That's time in the process to the police car pull up. There was a police car that pulled out into the I think it's hard to tell from the body worn camera. It's around that time, but it's hard to make out because the way the worldwide news parking lot is the railing is close to the sidewalk of ST Paul. So there's a significant parking lot that's about it to it. So it's not as if the police car it's hard to tell from the video where the police car parked in relationship to what was going on. That's my point. At some point where you argue this is all consensual, a police car pulls up after all, Baker is on a bicycle and is less threatening. But when the police car pulls up, they know it's more serious at the point that in the first two minutes of the body worn camera video where you see the indication of that a police car has arrived on scene there when he says it's okay, you can hang here. You don't have to leave. Is the police car there already? I'm not sure. Well, that seems important to me since counsel is arguing. That's the moment when he sees your honor when you know the interaction is between Baker that we have filmed is between Baker and the three men. And up until that point, there's there's traffic because ST Paul is a busy street. So there's a lot of activity going on. But the reality is the presence of a police car joining this little consensual discussion. You can't ignore that. It means it's much more serious, but it could also mean that the police car is parking there for other reasons. The record, though, shows what we see is in the record in terms of the interaction between Officer Baker and the three men is consensual, and it happens very quickly. But you're saying that a seizure takes place when he looks at the I. D. Card, and you're saying that the basis for that And we're supposed to infer that he was aware of that bulletin because shortly after the seizure, he went to the police car and placed a call. And it's to Cynthia Moore tour, and we know that How do we know it's to Cynthia Moore tour? And we because it's somewhat confirmed by investigative murder tour in the course of research for an application. But it's also the findings that were made by the court below that that call was to Cynthia murder tour. And then also, I think that begs the question, right? We're asking what's the basis for the district court's finding, right? That's correct. And I'm saying it's in the affidavit. Well, in the affidavit, it's basically Cynthia murder tour indicates that she had been contacted by Officer Baker as having stopped Felipe Amante Polanco at Worldwide News with the card of Soto Torres. Also, in the course of the body worn camera interaction, Officer Baker actually makes multiple calls to investigate a murder tour. And in one reference actually uses Cindy or describes to another officer on scene. I just spoke with Cindy in reference to the bulletin. So the question I think the fair inference can be made that the call was the first call was to investigate a murder tour based on the affidavit search warrant. Investigator March are issued and based on if you continue watching the video, the contact that Officer Baker had back with in relationship to what he names as the bulletin. But all this happens after he has the idea in his hand anyway. You can see that he was seized at the moment that he got the idea and didn't return it in any event. I would concede that the stop had become something else. More detentionary, less of a consensual thing. As soon as he saw the I.D. and saw that he had given the I.D. in the name of Manuel Soto Torres. And he knew that because he knew Almonto Polanco from a previous interaction he had with him. So he would knew he was looking at an I.D. card of someone who was not standing in front of him. Correct. He had the week before in a July 17th field information form had described a previous had described an encounter with an individual who identified themselves as Manuel Soto Torres and as living at 113 Mile. Previously identified himself as Soto Torres. Correct. And that's in the search warrant affidavit as well. Unless the court has any further questions, I'm well beyond my time. I'll audit. Thank you. The government rests on its brief. Vital to the district court, the magistrate judge and then the district courts finding a probable cause or reasonable suspicion for the detention was the officer awareness bulletin. That did not come into play. The defense wasn't given a copy of it. The government didn't rely on it until post hearing briefing. So it was only then the government produced that as an exhibit. The government did not say in its moving papers that this particular officer received that bulletin. What the government did say is it had been distributed department wide. First of all, that is a factual statement that the government should not have the key to a determination in this case. That the government should not have been making, the government should have had somebody with personal knowledge, the officer, Baker, the investigating officer, Murator, file an affidavit stating that. In terms of what happens on the scene, the reference to the bulletin, the dispatcher, the dispatch that officer Baker receives early on in the interaction talks about a shooting that has just occurred. The fact that he calls somebody who is, as the government is correct, that in the videotape she's referred to as Cindy. In her affidavit she does say she spoke with officer Baker. That's part of our suppression argument with respect to the warrant. But the officer, we have no idea if she was discussing with him the hearing. The government argued that all the evidence that the magistrate judge and the district court would need to make the determination was in the body cam footage. And then at the last minute the government completely changed positions and relied extensively on the officer awareness bulletin. And what did the defense do at that point? Defense counsel did nothing. The client, Pro Se, and both the district court and the magistrate judge say they are considering the Pro Se submissions. Mr. Amante Polanco very specifically and precisely said that reliance on that information deprived him of his Sixth Amendment right and his right to due process. And it did. The government should not have been permitted to introduce that evidence, if for lack of a better word, that One is called an officer awareness bulletin. Another is called an officer safety caution bulletin. It's not even clear that both of those bulletins were part of one unified document. The record is unclear as to that. And nothing that officer Baker says confirms that the bulletin that is vital to the district court magistrate judge's findings of the requisite level of suspicion in this case was that bulletin. Is it your argument that this behavior on the part of the government taints the whole arrest and search? I argue, Your Honor, that it was improper for the government to rely on evidence that it had repeatedly said it wouldn't rely on. I use that as an argument for saying that it was egregious conduct that would permit the court to review the validity of the questioning, essentially the Miranda issue. And I think I've addressed the court's other issues unless there are other questions. Thank you. Thank you both and we'll take the matter under advisement.